on behalf of the athlete, Mr. Robert E. Davis. Right. Thank you, Mr. Stone. Thanks. May it please the court. My name is Jed Stone and I represent Vincent Reyna, who is the appellant in this case. We're starting a few minutes early. One time we did this before and somebody came in the courtroom. You're not expecting anybody else. I'm not expecting anybody else. We did it once and somebody came in. I appreciate that courtesy and I'm happy to wait at the court. And also, if I could ask, we do have our recording system on this time. Okay. Thank you. Okay. I guess we're really ready now. Thank you. May it please the court. Take two. I am Jed Stone and I represent Vincent Reyna. The narrow issue in this case is whether or not this court should remand the matter back to the trial court for a hearing on a second post-conviction petition. The larger question in this case is a question factored by a serious collection of facts that should raise concern of the court. This was a 17-year-old boy who, in an act of drug-induced psychosis, killed his stepmother. There was no previous history of violence or anger between the boy and his stepmother. The record is replete with evidence that he had been on a polysubstance abuse binge that included the ingestion of PCP on that day. And that all of that information was available to his trial counsel and to the trial judge. In a pre-apprendi world, following a plea of guilty, the judge sentenced this 17-year-old boy to 65 years in prison, not finding that it was drug-induced, not finding that it was a psychotic event, not finding that the polysubstance clearly played a role, but finding out of nowhere that it was brutal and heinous and indicative of wanton cruelty. And therefore extended the term from a 20- to 40-year sentence to a 65-year sentence. If I can go back a minute to the procedural question, maybe. You agree that there was no leave obtained ahead of time to file this successive post-conviction petition, correct? I think that procedurally that's correct, although the trial judge did not dismiss the successive petition and pushed it to a second stage. Well, in the Spivey case, the judge ruled on the merits of the petition, but the court said that that really isn't sufficient. I mean, you've got to separately ask for leave ahead of time. I think you also contend and argue that because the reasons were set out in the petition itself for failure to file it earlier, then that was sufficient. But we have the Wiles case that says otherwise. Why should this court not follow Wiles? Because in this case substantial injustice would be done. This was not a lawyer's filing. It was a pro se filing. A pro se filing, by the way, from the basement of the Tams Correctional Center. A pro se filing from nowhere. And the court ought to, in the interest of justice, excuse the formality of seeking leave to file, especially where the judge did not dismiss the petition as being patently without merit. What authority are we able to do that on? And, you know, I think you can make a very compelling case in the matter of fundamental fairness that rules should be relaxed under certain circumstances. As you know, we have the recent LaPointe case, an Illinois Supreme Court case, that holds very clearly that a successive petition was not being filed until the trial court expressed it grants leave. They didn't appear to allow any exceptions. So on what legal basis do we ignore that and sort of engraft a fundamental fairness component to this? Because that's really, in essence, what you're saying. It's clearly what I'm saying, although I'm not asking you to ignore LaPointe or ignore the Supreme Court. I'm asking you to carve out an exception for a pro se litigant who at the time that he was thrown into the prison system was a teenager, a child, who was badly neglected by his lawyer, a lawyer hired by his dad, both for the trial court proceedings, the plea essentially, and a ill-conceived first post-conviction petition. And it was these are facts, I think, that call out to a fair-minded court to grant relief. Well, let me ask you this, taking this stuff further. We have the LaPointe ruling by the Illinois Supreme Court. It's not an appellate court decision. It's not ours. It's the Illinois Supreme Court. How do we carve out an exception from a bright-line ruling? We have a bright-line ruling set down by the Illinois Supreme Court. How do we carve out an exception? It's not a legislative. They have the Post-Conviction Act as a legislative matter. There's nothing in there that allows for the carving of an exception that I agreed. I don't see any case law now subsequent to LaPointe that allows for the carving of an exception. So on what legal basis, I'm asking you candidly, do we carve out an exception? What's our legal authority for carving out an exception to a Supreme Court decision? Without sounding the least bit sarcastic, we would hope that the legal authority would rest in a majority opinion in People v. Reyna. We're asking you to look at the facts of this case and to see if somewhere I want to use the word Rachmaninoff, but I'm not sure that it's one clearly understood by all. It's a Yiddish word for... The writ. Right. I want you to look at the facts of this case and see that this boy was poorly represented by a counsel hired by his father and from the basement of Tams figured out at long last that he had been hoodwinked. That when his lawyer said he couldn't get more than 20 and in a post-apprendi world he couldn't get more than 40, in a post-apprendi world he surely couldn't have gotten more than 40, when his lawyer said that 40 would be the top, when his lawyer filed a post-conviction petition and in spite of the admonitions of People v. Davis never sought or obtained transcripts of the plea, when his new lawyer, a young lawyer from my office, spent hours and hours searching for Eugene Hinton, the court reporter, finally found him in Florida and was hopeful that we could finally find the transcripts and found that the transcripts had been destroyed in a hurricane, that that became a perfect storm, if you will, for relief. I understand the law and I would hope that sometime the law could be tempered by mercy. I understand LaPointe, but I do believe that in this case, this young man deserves to have a hearing on his post-conviction petition where we can either prevail or fail on the question of ineffective assistance of counsel, but at least let's have a hearing on it. And I don't know the vehicle to get him there other than asking you to reverse the trial judge's dismissal and order an evidentiary hearing. It's his last hope. This boy is now 37 years old and has spent the last 20 years behind bars. I'm hopeful that someone will look at the facts of this case and understand that this was an injustice and by that injustice right the wrong in some way. I understand the burden that I've got. I know the hill I'm climbing, but I don't know an alternative other than ask you to push me up the hill and get us some relief. Thank you, counsel. Thank you. Mr. Davidson. Good morning, Your Honors. Please, the card. I have a little different perspective of this case. First of all, I think that the law is clear. The LaPointe case, the Wiles case, Spivey. In Wiles, this court cited the Daniels case from the 4th District. In both Wiles and Daniels, the defendant tried to seek leave in the petition, in the successive petition itself, and both this court and then the 4th District said you can't do that, that's not sufficient. But LaPointe is controlling, and there are no exceptions. I think LaPointe should be followed. What about his argument? The trial court is exalting form over substance. I mean, the court could have dismissed this, but not at the first stage. The court lets it go. Should have, but I think that's the exact language that this court used in Wiles, though, and said that that's insufficient, that you still have to request leave. I think I cite the language from Wiles that even though the judge makes a ruling allowing it to go forward, that does not comply with the statute to seek leave. I think that's what Wiles holds. And Wiles holds. Is there anything legally that would prevent this court from carving out the exception that Mr. Stone is arguing for? Well, I don't think there's an exception in LaPointe. So this court could write an opinion saying LaPointe didn't address this problem, maybe we could carve out an exception, see what the Supreme Court does with it. But I want to emphasize, Your Honor, this is not the only problem with this case that the petitioner has. And I think the second thing is, first of all, we argue it should be, the dismissal should be affirmed because it was a successive and no leave. The second reason it should be, the dismissal should be affirmed, is it's untimely far beyond the limitation period. The limitation period applicable to this case is three years unless the petitioner makes a factual showing that the delay was not based upon his culpable negligence. The guilty plea in sentencing in this case was in 1990, January and March 1990. If you look at this record, which extends from 1989 to the present, the first mention in this record over a 20-year period was in 2005. That's when the defendant first raised the claim that his lawyer, who was a retained lawyer by the way, Mr. Adair, told him that he would get a maximum of about more than 40 years. He guaranteed it. There's an affidavit from the defendant dated February 17, 2005. There's an affidavit from his father dated January 31, 2005. That's the first time that this issue was raised in this record. He did not take a direct appeal. He, in 1995, he did request a transcript. We argue that what that shows is that he didn't mention this at that time. In the reply brief, they suggest that I misrepresented his actions. I'm going to quote from the defendant's own brief. This is in their statement of facts. In 1995, Vincent, the defendant, attempted to obtain copies of the reported proceedings in his case. At that time, he filed a motion to proceed in formal paupers and request for free transcripts, stating that a transcript of the guilty pleas are essential to proceed with the post-conviction petition. In the affidavit, in support of the trial transcript, he stated that he was, quote, requesting trial transcripts and common law records pertaining to his sentencing, hearing, and judgments thereof, and further stated he needed the transcripts and common law records to, quote, review and extract documentary evidence that demonstrates support for the alleged constitutional violations. Now, once in this affidavit or in this request did he mention the obvious thing, he was sentenced to a term of imprisonment that he was not advised of, and that the record would show that. I'm not saying this is controlling, but this was a time that he acted without counsel, without that Mr. Adair, the retained counsel. And he had the opportunity to explain to the court why he should get a free transcript far beyond the time that Hurricane Ivan caused the destruction of these records, and Hurricane Ivan was in 2004. So this was long before that. Then in 2001, he decides to file a post-conviction petition. If his affidavit in 2005 is to believe people, his affidavit and his father's affidavit, they hired the exact same person who in 1990 they knew falsely guaranteed a certain sentence, who told them falsely what the plea agreement was. They tried to excuse their negligence or claim no culpable negligence on the line of cases. Well, if you rely on counsel, that can show. Well, the Supreme Court cases that we cite, Stuart is one, that it talks about, yet you really can't expect counsel to raise his or her own ineffectiveness, whether they won't do it or they just don't see it. And you can't really expect a defendant who's untrained in the law, a layperson, to go out and search for acts of ineffectiveness, to identify acts of ineffectiveness. First of all, defendants don't know what all the duties are, etc., etc. This isn't that type of case. This is a case that in March of 1990, he knew his lawyer lied to him, if he's to be believed. Also, the other case we cite, Risley case, is an example of the petitioner filed beyond the time period. His explanation was, my lawyer on direct appeal told me I had three years to file. In fact, it was six months. Both the lawyer and the client agreed, yeah, I told him that. And the Supreme Court, in finding that that was not negligent, said he had every reason to believe, to rely on this lawyer's advice, he had every reason to believe this lawyer, he had every reason to believe that he was filed with the time period. In this case, he had every reason not to rely on this attorney in 2001 because this was the guy that he claims lied to him. When that petition was filed in 2001, the defendant knew his dad, who the only issue raised, was an apprentice. They knew that this issue that they had been aware of for over ten years wasn't raised. So you're saying it's not only the holding in LaPointe, which serves as a legal impediment to the filing of a successive petition, you're saying that on merit, under the cause and prejudice test, he would not be able to meet bail. Absolutely. Irrespective of LaPointe. Cause and prejudice for the successive, and the untimely petition, that he has failed to show a lack of culpable negligence. So those are the two grounds that I think that fundamental fairness falls short, because this was done so long ago. And I find an interesting quote in the defendant's reply brief. In fact, Mr. Rayner expected the transcripts. Now he's talking about in 2005-2006 at the successive post-conviction petition. Mr. Rayner expected the transcripts to be produced upon the courts advancing the case to the next stage of the proceedings. Mr. Rayner expected the transcripts to corroborate his claims that he was never admonished and was taken by complete surprise at the sentence of 65 years. He would have had this same expectation in March of 1990. He knew then, 15 years earlier, that if his claim was right, that what those transcripts would show. So again, we have 15 years between. The other issue I would like to address in a couple of minutes is the last one on the one cruelty finding. The enhanced penalty. The basic claim of the defendant, I think, if you read, particularly if you go through his reply brief, is that the judge committed plain error by finding that this murder was accompanied by brutal and heinous conduct, indicating lawful cruelty. What the defendant does is rely on portions of the psychiatric reports, not all of them. There were two psychiatrists, one at the request of the state's attorney, Dr. Layberg. There was another psychiatrist who examined the defendant at the request of the defendant, Dr. Conroe. What you can't find in the defendant's brief is the conclusion of Dr. Laymeier, the one by the state's attorney. Dr. Laymeier's report, and this is in our brief on page 16, it's also in the common law record. The defendant appears to be a sociopath. He is clearly fit to stray on trial. He was also clearly sane at the time of the incident. He says, although he was high on drugs, he knew what he was doing and, in fact, formulated the idea that he should go ahead and finish the job after the first point he stabbed his stepmother. He told himself, I'm going to finish the job. This was corroborated by his own psychiatrist, Dr. Conroe, said the same thing, that after the first stabbing, the defendant said to himself, I might as well finish the job. Dr. Conroe, again, the defense psychiatrist, also said he had no problem remembering his actions. He was cooperative, straightforward. And although Dr. Conroe felt that these drugs did affect his conduct on that day, which the other psychiatrist says no, Dr. Conroe did not say in his conclusions that the defendant was unfit, the defendant was insane, that the defendant did not know or could not control his actions at that time. So it's clear to me that the trial judge, the sentencing judge, could have relied upon one psychiatrist's opinion over the other. But also, there's more. Dr. Conroe, the defense, also said that the defendant told him that the stepmother denied his request for money, she had a, quote, attitude, and that she was screaming at him. He also said, however, he picked up the knife before she started screaming at him. Dr. Conroe also stated that the defendant told him that after the stabbing, which I'll explain in a minute, the defendant had the presence of mind to try to hide his crime and make it appear that this was a murder committed during a rape. So he took the panties off his stepmother, pulled up her dress to make it appear like it was a rape. Again, this was after this attack, which Dr. Conroe described as ferocious. Specifically, the defendant inflicted 47 stab wounds, 31 incise wounds or slashing wounds. He stabbed her in the heart, the liver, the lungs, the kidneys. Her death was not caused by an initial strike. The cause of death, according to the record, was the result of multiple stab wounds. So, and then after this is when he tried to make it look like a murder during a rape. And Dr. Lamar concluded in his report that the defendant shows no remorse for his conduct. So it seems to me, based upon a plein air argument, first of all, this is discretion, a discretionary finding at that time, and the record fully supports it. There was no objection, no direct appeal, no nothing. There's no reason why his counsel, a retained counsel at that time, even if he wasn't going to raise his own ineffectiveness, he could have raised this issue. He could not have raised the fact, if true, that the judge did not advise him of the sentence. But ironically, nothing was raised until 2005 on this point, and that was after the court reporter's notes were lost by natural disaster, Hurricane Ivan in 2004. So, I mean, this long delay is the reason why there's no transcript now. He had filed a direct appeal within three years, if he had told the court in 1995 why he needed. The other thing is he had retained counsel twice. He could have paid for the record in 1995 if it was that important. So I think when you look at this entire record, the trial judge here was absolutely correct in dismissing this. I think the reasons may or may not have been right, that it should not have been dismissed at the outset, but still the dismissal should be upheld. If there are no questions, I thank you very much. Thank you. Thank you. Mr. Stone. Thank you very much. Counsel, would you be kind enough to first address the timeliness or untimeliness argument, please, and what counsel stated about the failure to show lack of culpable negligence? I think the record does show a lack of culpable negligence. It shows that because in 1995 this young man did request pro se from the basement of TAMS a copy of a transcript, which he believed would show what he now claims and his father now claims to be the proof, that he expected a sentence of 40 years or less, that there was no basis, as he understood it, for the trial court to extend the term. And this is a boy with an eighth grade education who at 17 was thrown into prison and remains there. He cannot be culpably negligent for the mistakes of his previous counsel, who had a duty under Davis to obtain transcripts before he filed the first post-conviction petition and never did so. It's inconceivable to me that we would blame Mr. Reina for slowly, slowly, slowly figuring out how to get his foot into the door of the courthouse in a meaningful way. If there were a system of medicine in this country where you were diagnosed with a disease and you couldn't get treatment for it because you hadn't made a timely request for treatment or because you didn't ask permission for the treatment by asking leave to be treated, no one in this world would tolerate a system of medicine like that. The system of jurisprudence is no less important. He filed a petition pro se. The judge granted the, didn't dismiss it, and ordered the state to respond to it. That is an act of giving leave to proceed. Excuse my interruption, Your Honor. Please. Two questions. One, on your medical analogy, I suppose a more apt analogy would be if you neglected to purchase insurance before you might be deprived of treatment, and that's a system that we have. But the second question I have for you, what is it you're looking to find in these transcripts that's going to reflect any light on statements by counsel to the defendant? Is there some suggestion that something might be in the record to that effect? If the record shows no admonition of an extended term, then an extended term should not and could not have been lawfully given. Well, that wouldn't have any bearing on whether his lawyer had misled him on the issue. No, that's true. I think we prevail on that with the affidavits of Vincent and his father, at least enough to get a hearing, an evidentiary hearing before a judge. And I think you're exactly right. It is a question of if you bought insurance too late or weren't covered, do we let people die? Do we not treat people? I think we do. No, as a matter of fact, in this country we don't. We have emergency rooms in hospitals and charities and foundations that provide medical relief. No one would tolerate a system of medicine like the system of law that we've created. No one would tolerate it. It would be fundamentally, shockingly unfair. I'm hoping that this Court sees this young boy, a 17-year-old, who made a series of foolish decisions but had an eighth-grade education to back that up. A series of foolish decisions. Of course it would have been better if he'd hired a different lawyer for his first PC. Of course it would have been better if instead of using flowery language in his pro se application to proceed in form of barbarous, he would have said in plain language, I need these transcripts to prove that I was never advised of my rights. But he's not a sophisticated, complicated-thinking kid. He's an eighth-grade educated 17-year-old, now 37-year-old, with a polysubstance abuse background. I'm hoping we can find a way to I'm not asking that we open the prison door for this boy. I'm hoping we can find a way to open the courthouse door so that my office can represent him in a post-conviction petition evidentiary hearing and get a new sentencing hearing. I appreciate the Court's indulgence this morning. Thank you, counsel. Thank you. Any questions? At this time, the Court stands in recess.